**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 6, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

MICHAEL ALLEN BROWNING,

Petitioner - Appellee,

v.

ANITA TRAMMELL, Warden,
Oklahoma State Penitentiary,[*]

Respondent - Appellant.

No. 11-5102

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-07-00016-TCK-PJC)**

---

Jennifer L. Crabb, Assistant Attorney General (E. Scott Pruitt, Attorney General of Oklahoma, with her on the briefs) Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma, for Respondent-Appellant.

Jack Fisher, Fisher Law Office, Edmond Oklahoma (Paul S. McCausland, Young, Bogle, McCausland, Wells & Blanchard, P.A., Wichita, Kansas, with him on the brief) for Petitioner-Appellee.

---

Before **LUCERO**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

[*] Pursuant to Fed. R. App. 43(c)(2), Randall G. Workman was replaced by Anita Trammell as Warden of the Oklahoma State Penitentiary on March 1, 2013.

This appeal requires us to consider the conviction by an Oklahoma jury of Michael Allen Browning for the heinous murder of Harry and Teresa Hye, the parents of his girlfriend Cenessa Tackett. Browning received a death sentence as punishment for these crimes. The Oklahoma Court of Criminal Appeals affirmed this conviction and sentence on direct appeal, *Browning v. Workman*, 134 P.3d 816 (Okla. Ct. Crim. App. 2006), and denied post-conviction relief.

What the jury did not know—and the defense attorneys also did not know—was that Tackett, who became the most important witness at trial, had been diagnosed with a severe mental disorder. According to records from her psychiatrist that were in the State's possession, Tackett blurred reality and fantasy, suffered from memory deficits, tended to project blame onto others, and had an assaultive, combative, and even potentially homicidal disposition.

In subsequent federal proceedings, the contents of Tackett's mental health records came to light, prompting the federal district court to grant a conditional writ of habeas corpus under 28 U.S.C. § 2254(d). The district court reasoned that Tackett's mental health records were favorable to Browning and material to his defense, especially considering Browning's trial strategy to paint Tackett herself as complicit in the murders. The district court therefore ruled that the Constitution obligated the State to disclose those records to Browning before trial pursuant to *Brady v. Maryland.*

-2-

Given the central role Tackett played at trial and the severity of her mental health diagnosis, we agree with the district court that the psychiatric information was favorable to Browning and material to his defense, and that the Oklahoma courts could not have reasonably concluded otherwise. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. Legal Background

This case turns largely on principles the Supreme Court established in *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Court held that an individual's constitutional right to a fair trial obligates the prosecution in a criminal case to turn over evidence to the defense in certain circumstances. *Id.* at 87. Specifically, "[u]nder *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (reversing conviction).

Evidence is "favorable to the defense" if it is exculpatory or impeaching. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith*, 132 S. Ct. at 630 (internal quotation marks omitted). "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to

-3-

undermine confidence in the outcome of the trial." *Id*. (internal quotation marks omitted; alterations incorporated).

Further, materiality "is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995). Instead, the defendant must show the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Difficulty arises, however, when the *Brady* obligation to disclose comes up against the various legal privileges that protect sensitive information from disclosure, such as the psychotherapist-patient privilege at issue here. In such a situation, the Supreme Court has directed lower courts to review such information *in camera* to determine whether it meets the *Brady* standard. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57–58 (1987). If so, the court must order the prosecution to turn over that information to the defense. *Id*.

How these principles played out in Browning's prosecution is the focal point of this case. With this context, we therefore turn to the facts.

## II.  Factual & Procedural History

### A.  The Crime

In the early morning hours of February 18, 2001, Harry and Teresa Hye, residents of Glenpool, Oklahoma, were shot to death and their house burned to the

ground.  Their adopted daughter, Cenessa Tackett, was also shot but survived and managed to escape the burning house.  Tackett soon identified two perpetrators: her former boyfriend, Michael Browning, and another man named Shane Pethel.

As explained in more detail below, Tackett believed that Browning wanted to kill her because she was pregnant with his baby, and Browning did not want to pay child support.  Browning also needed to kill the Hyes because they knew that Tackett had identified him as the father.  Browning allegedly recruited Pethel to help carry out his plans.  The State arrested Browning and Pethel and charged them with capital murder.

### B.  Tackett's Mental Health Records

Pretrial proceedings in this case took nearly two years.  About halfway through that process, Tackett's attorney (for unknown reasons) faxed two psychiatric reports to the prosecution.[**]

The first report, dated October 29, 2001, summarized a psychiatrist's conclusions after five recent visits with Tackett beginning on October 4, 2001—about eight months after the crime.  According to the report, Tackett displayed "magical thinking" and a "blurring of reality and fantasy."

---

[**] These records are sealed but the parties summarize them extensively and sometimes quote them in their publicly filed briefs.  *See* Aplt. Br. at 8, 14, 19; Aple. Br. at 2, 3, 18, 40, 44, 46–48, 51.  Having compared the publicly available material to the sealed records themselves, we find that these summaries and quotations fairly and accurately reflect the sealed material.  In describing the contents of Tackett's mental health records, we therefore confine ourselves to the portions already summarized or quoted by the parties.

The second report, dated November 26, 2001, contained even more disturbing information. It described Tackett as manipulative, grandiose, egocentric, and stated that she typically projected blame onto others. The report noted memory deficits as well. It described Tackett as a "code type . . . rarely seen except in inpatient facilities." Most strikingly, according to the report, "*An assaultive, combative, or even homicidal potential must be carefully considered*" (emphasis in original).

When the prosecution received these reports, it revealed their existence but not their contents to the defense. Browning moved to compel production. The prosecution then contacted Tackett's lawyer, who replied with a letter saying her office had mistakenly faxed the psychiatric reports to the prosecution and that Tackett had not authorized release of those medical records to anyone. Tackett's lawyer therefore requested that the prosecution seal the reports and return them.

After multiple hearings on the motion to compel, the trial court reached three conclusions, none of them helpful to Browning. First, it found that Oklahoma's psychotherapist-patient privilege protected the psychiatric reports. Second, it found that the privilege had not been waived through the mistaken disclosure. Third, following the *Brady* framework, it concluded that the reports contained no material exculpatory or impeaching information. It reached this last conclusion by examining the reports *in camera*, as directed by the Supreme Court in *Ritchie*. Accordingly, the trial court denied Browning's motion to compel.

## C. The Trial

The trial court severed Browning's case from that of his co-defendant, Pethel. Browning's case went to trial first.

### 1. The 911 Calls

Before Tackett testified, the State played recordings of her two 911 calls. R., Trial Tr., Vol. VII at 1218–19. The tape of the second call features a police officer arriving during the course of the call and having the following exchange with Tackett:

> Q. What's the suspect's name? Who shot you?
>
> A. Mike Browning. And—I'm pregnant with his baby and he didn't want me to have it.
>
> Q. [*indecipherable*] suspect [*indecipherable*]
>
> A. [*indecipherable*] I remember them [*indecipherable*] and I been shot right here.
>
> Q. Okay, who's they?
>
> A. Mike—and his best friend Shane. But it wasn't Shane because I know Shane.
>
> Q. How many people were in the house when you got shot?
>
> A. Me—[*overlapping indecipherable conversation between officer and dispatcher*]—Mike Browning—[*overlapping indecipherable conversation between officer and dispatcher*]—and this other guy. . . .

R., State's Trial Ex. 2 at 3:30–4:00 (audio cassette recording).[***]

### 2. Tackett's Trial Testimony

No direct evidence besides Tackett's testimony connected Browning to the crime. The State's case therefore stood or fell largely on Tackett's eyewitness testimony and its credibility. Tackett's version of events is as follows.

Tackett and Browning became romantically involved in the mid-1990s. Early in the year 2000, they ended their relationship and both began seeing new people, but they would still occasionally have sex with each other. One such encounter took place in August 2000. Tackett soon learned she was pregnant.

Tackett and Browning did not see or speak with each other again until January 2001, when Tackett and Teresa Hye called Browning to tell him about the pregnancy. Browning responded angrily and refused to pay future child support, maintaining he did not believe the baby was his and would insist on a paternity test.

Tackett and Browning again did not see or speak with each other for another month. Then, on February 18, 2001, Browning knocked on Tackett's door at around 3 a.m. Tackett was awake and watching television. She let

---

[***] The court reporter did not transcribe the tapes into the trial record. This is our transcription of the relevant portion of the second call. Another transcription—not materially different from our own—appears in the record as part of Browning's motion to the OCCA for an evidentiary hearing. *See* R., *Browning v. State*, No. D-2003-363 (Okla. Ct. Crim. App.), Appl. for an Evidentiary Hr'g, Ex. 1B at 6 (filed June 21, 2004).

Browning into the house along with a stranger, whom she later identified as Shane Pethel. Tackett specifically remembered that Browning was wearing "black pants, brown shoes, gray shirt, tan hat, and a camouflage coat." R., Trial Tr., Vol. VII at 1349.

Teresa Hye soon woke up and joined Tackett, Browning, and Pethel in the living room. A few minutes later, Pethel pulled out a gun and forced Tackett and Teresa Hye to sit quietly while Browning bound and gagged them with duct tape. The two men then retrieved Harry Hye from the bedroom and tied him up next to his family. At some point, Browning told Tackett that she "should have kept [her] legs closed." R., Trial Tr., Vol. VII at 1365.

While the Hye family sat tied up on the sofa, Pethel and Browning carried the family's valuables to a truck in the driveway.**** Browning and Pethel then carried the three victims into an interior closet. Browning tried but failed to set the closet carpet on fire. At Pethel's suggestion, Browning then doused the hanging clothes with lighter fluid and lit them instead.

Pethel said, "It is time," and shot Harry Hye in the head. Teresa Hye began to scream and Pethel shot her as well. Finally, he shot Tackett. R., Trial Tr., Vol. VII at 1402.

---

**** The truck turned out to be Pethel's, and the property was later recovered from Pethel and a friend.

Tackett was not killed—she received only a minor flesh wound to the soft tissue on the top of her shoulder, and also a grazing wound on her neck that might have been caused by the same bullet. Tackett nonetheless fell against her mother and lay still, playing dead. Once the men left, she managed to remove her duct-taped pants, find a phone, run outside, and call 911. Tackett then reentered the house, found a blanket, exited the house, soaked the blanket with water from an outdoor spigot, covered herself, reentered the house, and attempted to rescue Harry Hye—who was critically injured but still alive. Tackett dragged Harry as far as the kitchen. Leaving him there, she went back toward the closet hopefully to get Teresa. At this point, however, the fire had grown too intense, forcing Tackett to retreat outside. She called 911 again and first responders soon arrived.

Teresa Hye died in the closet. Harry Hye was rescued from the kitchen and transported to a hospital, but died there shortly afterwards. Tackett was also transported to a hospital for treatment of her flesh wound. Police questioned her at the hospital about what had happened. Tackett identified Browning as one of her assailants. She picked Pethel out of a photo lineup and identified him as the other assailant.

By Tackett's own admission, she told one lie to the police during this questioning. Specifically, she told the police that Browning or Pethel had shot her dog and set fire to her two birds. Tackett explained at trial that this never happened, but she said it to the police anyway because she believed the

accusation "would get [Browning and Pethel] in more trouble." R., Trial Tr., Vol. VII at 1416.

### 3. Tackett's Cross Examination

The defense's theory of the crime was that Tackett had a motive to kill her adoptive parents because she stood to inherit some amount of money or valuable property. In the defense's view, Tackett and Pethel were not strangers, but had met when Tackett attended softball games in which Browning and Pethel participated. The defense believed Pethel and Tackett conspired to rob and murder the Hyes and frame Browning. The defense further believed that Tackett chose to frame Browning in retaliation for his relationship with another woman. On cross, defense counsel attempted to bring out details supporting this theory.

Counsel was only partially successful. Concerning the supposed motive to kill her parents, Tackett confirmed that she spoke with the family's probate attorney not long after the crimes occurred, that the Hyes "[p]robably" had a will, and that she expected to receive "a little bit of money out of [a] trust" established by the Hyes. R., Trial Tr., Vol. IX at 1628. But she did not know when or how much. Tackett also agreed with defense counsel that her relationship with Harry Hye (although not Teresa) was sometimes strained and she had twice run away from home—including once by commandeering a golf cart and driving it down the highway. Tackett further confirmed that when she dragged Harry Hye to the

kitchen, she dragged him directly past the front door—which was unobstructed—instead of dragging him out of the door.*****

Concerning a motive to frame Browning, Tackett agreed with defense counsel that, after her breakup with Browning, she still cared for him and felt some jealousy in light of his new relationship. Tackett confirmed that, sometime after getting pregnant but before telling Browning, she telephoned Browning's new girlfriend and had a "pretty ugly" conversation. R., Trial Tr., Vol. VIII at 1447.

As to Tackett's previous acquaintance with Pethel, she consistently denied ever having met him before, at softball games or otherwise. Notably, defense counsel failed to use the second 911 call against Tackett, *i.e.*, the call in which she identified her assailants as "Mike—and his best friend Shane. But it wasn't Shane because I know Shane."******

---

***** Tackett had elsewhere explained to police (although it apparently did not come out at trial) that she avoided the front door out of fear that she might be seen there if Browning and Pethel returned. *See* Aplt. Br. at 17 n.3. She testified at trial, however, that she exited the front door at least twice before returning for Harry—first to call 911, and again to soak the blanket in which she wrapped herself before reentering. *See* R., Trial Tr., Vol. VIII at 1600–06.

****** Later in the trial, an investigator who spoke with Tackett at the hospital testified that Tackett said she had been attacked by Browning and "a guy named Justin." R., Trial Tr., Vol. X at 1974; *see also* Vol. XI at 1993, 2001–02. Browning's trial counsel's failure both to use Tackett's "I know Shane" words against her and to point out the inconsistency with the "guy named Justin" story prompted an ineffective-assistance-of-counsel argument that the district court did not rule on. R., Vol. 1 at 111–15.

-12-

Finally, in a move intended to cast doubt on Tackett's credibility generally, the defense elicited an admission about Tackett's initial reaction to the knock on her door at 3 a.m. Tackett confirmed a prior statement to police in which she reported that she first thought the ghost of a former occupant had made the knocking sound.

### 4. Other Relevant Evidence

Despite defense counsel's attempt to undermine Tackett's testimony, certain evidence corroborated at least parts of it. The police, for example, found Browning about twelve hours after the crime wearing the clothing Tackett described when she spoke with police shortly after the murders (although Browning's clothing did not smell of smoke or have any other signs of being near a fire). *See* R., Trial Tr., Vol. IX at 1774; Vol. X at 1952–53; Vol. XI at 2121–24. In addition, three witnesses saw Browning in a bar with Pethel between 1 and 2 a.m. on the day of the murders (shortly before the crimes took place) and one of those witnesses saw Browning and Pethel together soon after Tackett's 911 call.[*******] R., Trial Tr., Vol. IX at 1671–73, 1689–90; Vol. XII at 2321–22.

---

[*******] Browning gave no explanation for these facts at trial, although in a post-conviction affidavit he claims he spent the period when the murders were committed passed out drunk in Pethel's truck. R., Vol. 1 at 533–34. That, according to Browning, is where Tackett saw him and learned what he had been wearing that night. Aple. Br. at 60.

### 5. *The Quashed Subpoena*

Late in the trial, the defense unexpectedly subpoenaed Tackett's attorney, who had also been the Hyes' estate counsel. The defense intended to put the attorney on the stand to provide evidence of just how much Tackett stood to inherit. The attorney appeared as directed but argued that the information sought by defense counsel remained protected by attorney-client privilege because the inheritance would come through a trust and the terms of that trust had yet to be made public through probate or similar proceedings. The trial court agreed and quashed the subpoena.

### 6. *Closing Arguments & Verdict*

The prosecution used its closing argument to show the many ways it believed independent testimony corroborated Tackett's account, as well as to argue for the improbability of the idea that Tackett would conspire to kill the Hyes. Tackett, according to the prosecution, was a hero rather than a villain.

The defense countered that, in its view, various bits of Tackett's story did not make sense. Counsel emphasized that Tackett was the only eyewitness, but her testimony was "not very reliable," citing her initial belief that a ghost made the knocking sound she heard at 3 a.m.—which supposedly "shows the mindset of somebody who might just not be very reliable or perhaps even a little unstable." R., Trial Tr., Vol. XIII at 2399. Counsel dwelled on the lack of corroborating physical evidence, and that one of Pethel's friends could have been the

-14-

accomplice.  *Id*. at 2413.  Emphasizing inconsistent testimony, counsel argued,

> So the question now comes up, if Cenessa Tackett lied
> not once but twice to law enforcement simply,
> quote/unquote, to get Mike into more trouble
> supposedly, what else can you believe about her story?
> Do we get to pick and choose? . . . The State of
> Oklahoma wants you, as the jury in this case, to convict
> this young man on [the testimony of] an admitted liar.

*Id*. at 2418.  Finally, counsel touched on Tackett's testimony that the route she chose when attempting to drag Harry Hye out of the house took her past the front door but she did not exit with him there.

The jury deliberated about four hours and convicted on all counts.  The next day, the jury heard the penalty phase evidence and arguments, deliberated, and returned a sentence of death for the murders of Harry and Teresa Hye.

### D.  Pethel's Guilty Plea

Less than a week after the conviction, Browning's co-defendant, Shane Pethel, pleaded guilty in exchange for avoiding the death penalty.  Contrary to Tackett's testimony that Pethel himself had been the shooter, Pethel stated at his change-of-plea hearing that Browning shot Tackett and the Hyes.  But Pethel otherwise corroborated most of Tackett's story, including the perceived motive. Pethel claimed that Browning came to his house four days before the crime and explained that he wanted to "get [Tackett] out of the picture" because Browning's new girlfriend supposedly stated that she would leave Browning if a paternity test identified him as the father of Tackett's baby.  R., Feb. 11, 2003 Hr'g Tr. at 14.

-15-

Browning also worried that the baby would inherit a disease that runs in Tackett's family, thus increasing the likely child support costs. Pethel nowhere explained his own motive for participating in the murders, although his account implies he would get to keep the property stolen from the Hyes.

### E. Appeals and Collateral Proceedings

#### 1. The Ellis Affidavit

On direct appeal to the Oklahoma Court of Criminal Appeals (OCCA), Browning moved for an evidentiary hearing under that court's Rule 3.11. As part of his motion, Browning attached an affidavit from a man named Steve Ellis who claimed to have been Tackett's live-in boyfriend from March to November 2002—after the crimes but before trial. Ellis says that, while living with her, Tackett would sometimes talk about the death of the Hyes. In so doing, she would first "get to talking about Michael Browning having a hand in it, then switch to Shane Pethel. [Tackett] told me she met Shane Pethel through Michael Browning." Aple. Br., Attach. 1 at 1. According to Ellis, Tackett also exhibited "serious mental problems" and "had to take medicine to stay sane." *Id*. at 2.

Further, Ellis claimed Tackett told him the details of her inheritance. Specifically, says Ellis (and contrary to Tackett's testimony about her inheritance at trial), Tackett was already receiving monthly disbursements from the Hyes' trust, including the cost of rent and $500 for living expenses. Tackett and her brother also inherited 160 acres from the Hyes, which they hoped to sell for $1.6

million.********

## 2. The OCCA's Decision

Browning raised numerous arguments for reversal. As to the one issue relevant here—the trial court's refusal to compel production of Tackett's mental health records—the OCCA agreed with the trial court that Tackett's records were protected by Oklahoma's psychotherapist-patient privilege and that Tackett never waived that privilege. Further, said the court,

> [We have] reviewed the sealed material to determine whether it contained evidence favorable to Browning. We determine that the documents contain nothing material either to guilt or punishment. There is no reasonable probability that, had this evidence been disclosed, the result of the trial would have been different. As there was no waiver, and the sealed material contains nothing favorable to the defendant, this [argument for reversal] is denied.

*Browning*, 134 P.3d at 837 (footnotes omitted).

Browning then filed a post-conviction proceeding with the OCCA, raising arguments not relevant here. The OCCA denied that application.

---

******** Browning now claims that Tackett and her brother indeed sold that land, "result[ing] in proceeds of nearly $1,000,000.00 to [Tackett]." Aple. Br. at 8. In support, Browning cites land records showing that Tackett and her brother inherited and then sold at least some of the Hyes' land. R., Vol. 1 at 371–85. Those records do not contain the sale price, so the $1 million figure appears unsupported. But a post-conviction affidavit from someone claiming to have been Tackett's roommate from 2004 to 2006 states that Tackett received "over $900,000.00" from the Hyes. *Id.* at 368.

### 3. *The District Court's Decision*

Having exhausted state post-conviction remedies, Browning filed a 28 U.S.C. § 2254 petition in the Northern District of Oklahoma. Browning raised several arguments, including that Tackett's mental health records should have been disclosed. Reviewing those records *in camera*, the district court disagreed with the Oklahoma courts' conclusion that the records contained nothing favorable to Browning. It therefore ordered those records disclosed to Browning's habeas counsel—the first time any of Browning's attorneys had seen them—and called for further briefing on whether the OCCA's treatment of this argument was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

After further briefing, the district court concluded,

> The OCCA's determination of this issue was an unreasonable application of clearly established federal law in two respects. First, the OCCA's determination that the sealed material contained nothing favorable to Browning was an unreasonable application of Supreme Court law to the facts of this case. There is no reasonable argument or theory that could support the OCCA's conclusion that the sealed material contained nothing favorable to Browning's defense. Moreover, no fairminded jurist could review the sealed material and conclude the sealed material was not favorable to Browning. The sealed mental health records reflect that Tackett, the prosecution's key witness, suffered from severe mental illness which could affect her ability to recount events accurately and she was also prone to

-18-

manipulate and blame others. The sealed mental health records also contain information that could support Browning's theory that Tackett participated in the crimes with Pethel. This evidence is clearly both favorable impeachment and exculpatory evidence.

Second, the OCCA's conclusion that the sealed mental health records contain nothing material either to guilt or punishment was an unreasonable application of Supreme Court law to the facts of this case. Had the trial court ordered the disclosure of Tackett's mental health records prior to his trial, Browning undoubtedly would have been able to cross-examine her with the content to create doubt as to her ability to perceive and tell the truth regarding his involvement in the crimes. In weighing the materiality of the records, the Court notes that in Browning's trial, Tackett was not only the sole eyewitness but she was also a surviving victim. Her testimony was the only testimony directly linking Browning to the crime scene and the crimes. The guilty verdict in this case depended on Tackett's testimony
. . . .

R., Vol. 1 at 1133–34 (citation omitted). The district court therefore granted a conditional writ of habeas corpus, requiring the State to retry Browning within 180 days or release him.

## III. Discussion

### A. Scope of Federal Review

The Oklahoma courts found that Oklahoma's psychotherapist-patient privilege protects Tackett's psychiatric reports from disclosure—a conclusion beyond our review given that it is purely a matter of Oklahoma law. The Oklahoma courts further recognized that Tackett's psychiatric reports potentially

-19-

comprised *Brady* evidence. The Oklahoma courts therefore examined Tackett's

psychiatric reports *in camera* to determine whether they contain favorable,

material evidence that must be disclosed under *Brady*—just as *Ritchie* directs.

The Oklahoma courts saw no such evidence. Because that decision involved an

application of federal law, Browning applied for a writ of habeas corpus, asking

the federal district court to overturn the Oklahoma courts' decision.

But in the context of criminal proceedings such as these, a federal court's

authority to overturn a state court's decision is limited, even though the decision

involved a matter of federal law, to whether the decision "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

Under the "unreasonable application" standard—on which Browning relies—the

federal district court cannot grant habeas corpus simply because it disagrees with

the state court. Rather, if "fairminded jurists could disagree on the correctness of

the state court's decision," then the federal court must defer to the state court.

*Harrington v. Richter*, 131 S. Ct. 770, 785–86 (2011) (internal quotation marks

omitted).

Browning argues, however, that his *Brady* claim was not actually

"adjudicated on the merits in State court proceedings," and therefore we need not

defer to the Oklahoma courts' decisions. *See Cone v. Bell*, 556 U.S. 449, 472

(2009) (confirming that a federal court may review a state court's decision *de*

*novo* if the state court "did not reach the merits of [the prisoner's] claim").

Browning derives his argument from the *Ritchie* decision.

As noted, *Ritchie* held that courts should examine privileged material *in camera* to decide whether it must be disclosed under *Brady*.********* But the defendant in *Ritchie* wanted more than that. He wanted the right to have his lawyer "examine all of the confidential information, both relevant and irrelevant, and present arguments in favor of disclosure." *Ritchie*, 480 U.S. at 59. The Supreme Court acknowledged that "the eye of an advocate may be helpful to a defendant in ferreting out information," *id*., but nonetheless rejected that request. "We find that [the defendant's] interest . . . in ensuring a fair trial can be protected fully by requiring that the [privileged information] be submitted only to the trial court for *in camera* review." *Id*. at 60.

Given that *Ritchie* excludes defense counsel from weighing in on what should be disclosed, Browning contends that "there was no '*adjudication*' [of his *Brady* claim] as defined by American jurisprudence. The determination [that Tackett's psychiatric] records were not material resulted from an *ex parte* proceeding more akin to an inquisitorial rather than adversarial proceeding."

---

********* *Ritchie* applies only where the state-law privilege is not absolute. 480 U.S. at 58 & n.14 (expressly disclaiming any opinion about how to treat absolute privileges). An absolute privilege is one that contains no exceptions, even for law enforcement or judicial personnel. *See id.* No party has argued that Oklahoma's psychotherapist-patient privilege is absolute, nor did the OCCA's decision raise the issue.

Aple. Br. at 22–23 (footnote omitted; emphasis in original). Browning effectively

argues that *Brady* claims resolved through *Ritchie* are never "adjudicated" for

§ 2254 purposes (unless, perhaps, a judge allows defense counsel to inspect the

documents despite *Ritchie*). Thus, they would always be subject to *de novo*

review when raised in a § 2254 petition.

Browning has not pointed us to any authority establishing that "adjudicated

on the merits" necessarily requires an adversarial proceeding. He does point to a

recent Supreme Court decision stating that "[a] judgment is normally said to have

been rendered 'on the merits' only if it was 'delivered after the court . . . heard

and *evaluated* the evidence and the parties' substantive arguments.'" *Johnson v.*

*Williams*, 133 S. Ct. 1088, 1097 (2013) (quoting Black's Law Dictionary 1199

(9th ed. 2009)) (emphasis and ellipsis in original). We agree that this is what it

"normally" means to adjudicate a claim in the American legal system. But this is

not a normal situation.

As noted, if we were to hold that "adjudicated on the merits" necessarily

means "adjudicated through an adversarial proceeding," then all *Brady-Ritchie*

claims would presumptively fall outside the scope of § 2254(d)—as would any

other *Brady* claim where the trial court resolves a motion to compel by reviewing

the disputed evidence *in camera*. *See* 6 Wayne R. LaFave et al., *Criminal*

*Procedure* § 24.3(b) nn.71–74 (3d ed., Dec. 2012 update) (discussing *in camera*

review of potential *Brady* material in non-*Ritchie* situations). We see no

-22-

basis—and Browning has given us none—for creating such a categorical exclusion from the deference Congress plainly intended when enacting § 2254. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that "Congress intended [§ 2254] to advance" "the principles of comity, finality, and federalism" and to uphold a history of "careful . . . limit[s] [on] the scope of federal intrusion into state criminal adjudications").********** We therefore hold that a *Brady* claim resolved through the process established in *Ritchie* has been "adjudicated on the merits" for purposes of § 2254(d).

Given this holding, the district court was required to apply the deference prescribed in § 2254(d). According to the State, it is not clear if the district court applied such deference correctly. While initially in its order the district court cited to and applied the proper standard to its favorability analysis, quoting *Harrington v. Richter*, *see* R., Vol. 1 at 1126, 1133, it later stated with respect to materiality that "[t]he OCCA's decision was objectively unreasonable as a fair minded jurist could determine the withheld favorable evidence put the whole case in such a different light as to undermine confidence in the verdict," *id*. at 1138.

---

********** Courts have routinely applied § 2254(d)'s deferential standard to *Brady-Ritchie* claims. *See, e.g.*, *Hawkins v. Coyle*, 547 F.3d 540, 557 (6th Cir. 2008) (applying § 2254(d)'s standard where the evidence was reviewed *in camera* and never disclosed); *Rizzo v. Smith*, 528 F.3d 501, 506 (7th Cir. 2008) (same). But all of these decisions assume that deference applies without awareness of the argument Browning raises here. Thus, strictly speaking, they are not on point.

This sentence suggests that fair disagreement is reason to grant habeas relief, whereas it is actually a reason to deny it. *Richter*, 131 S. Ct. at 785–86.

In the end, however, it is irrelevant for our purposes whether the district court committed a slip of the pen or actually misapplied the "fairminded jurists" standard. Either way, "we review the district court's legal analysis of the state court decision *de novo*." *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004). Thus, we ask, like the district court, whether the Oklahoma courts' decision regarding Tackett's psychiatric reports "involved an unreasonable application of[] clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).***********

The State has not argued that the rights recognized in *Brady* and *Ritchie* are anything but clearly established, so our inquiry reduces to the following: Did the Oklahoma courts reasonably conclude that Tackett's psychiatric records contained nothing favorable to Browning or material to his defense? Given that neither the

---

*********** Browning does not argue that the Oklahoma courts acted "contrary to . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1). As for "a decision that was based on an unreasonable determination of the facts in light of the evidence presented," *id.* § 2254(d)(2), Browning claims that Tackett's lawyer was lying when she said that she had "inadvertently" disclosed Tackett's mental health records to the prosecution. Browning therefore argues that the OCCA unreasonably determined otherwise. Browning provides little support for this allegation beyond conjecture about what the prosecution may have been thinking, which is not sufficient to overturn the factual finding of the state court. In any event, it does not undermine the OCCA's finding that, as a matter of state law, Tackett's lawyer had no right to disclose Tackett's medical records without her express permission.

state trial court nor the OCCA gave any reasoned explanation of this conclusion, we must "determine what arguments or theories . . . could have supported[] the state court[s'] decision; and then [we] must ask whether it is possible fairminded jurists could disagree" on the favorability and materiality of the withheld evidence. *Richter*, 131 S. Ct. at 786.

### B. Scope of Evidence We May Consider

In evaluating favorability and materiality, we must first resolve one more preliminary question. Specifically, we must decide the universe of evidence we may consider. The Supreme Court recently held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). But "the record . . . before the state court" is not self-defining. Does it mean the record before the jury? Or does it mean the entire record generated by the state trial and appellate courts before the § 2254 petition was filed?

This is a distinction with a significant difference in this case. If we may consider everything that came before the OCCA—which included, *e.g.*, Browning's post-trial affidavits relating to Tackett's mental health, Browning's evidence of Tackett's inheritance, and Pethel's confession inculpating Browning—then our analysis may well differ from one limited to the evidence available at trial.

*Pinholster* itself demonstrates that we cannot interpret "the record . . . before the state court" necessarily to mean the record before the jury. *Pinholster* involved an ineffective-assistance-of-counsel claim that the Supreme Court reviewed on the record as developed in post-conviction proceedings in state court. *See id*. at 1403–06. This was so because the state from which the habeas petition originated, California, requires defendants to develop their ineffective-assistance claims in post-conviction proceedings rather than on direct appeal. But in any event, *Pinholster* shows that in certain types of cases, at least, "the record . . . before the state court" includes materials not available to the trial court.

In the *Brady* context, however, it is inappropriate to consider evidence developed post-verdict. To do otherwise would contradict Supreme Court cases applying *Brady* by analyzing how withheld evidence might have affected the jury in light of all other evidence it heard. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 290–96 (1999); *Kyles*, 514 U.S. at 441–53; *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) (discussing materiality in the context of how *Brady* evidence "could have affected the judgment of the jury").

In addition, the Supreme Court has emphasized that *Brady* "requires a prosecutor to disclose material exculpatory evidence to the defendant before trial." *Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 68 (2009). In *Osborne*, the Supreme Court faced a claim that a convicted defendant had a post-conviction *Brady* right to access and test DNA evidence in the state's possession—evidence

his defense attorney knew about before trial.  *Id.*  The Court rejected this argument, explaining that the defendant's claim "is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief.  *Brady* is the wrong framework."  *Id*. at 69.

If (as *Osborne* made clear) one's *Brady* right is a pre-trial right, then our analysis necessarily looks to what might have changed had the *Brady* evidence been disclosed before trial—or at least disclosed soon enough to give the defendant an opportunity to use it at trial effectively.  *See* 6 LaFave, *Criminal Procedure* § 24.3(b) ("lower courts agree that the *Brady* rule . . . requires only that disclosure of exculpatory evidence be made in sufficient time to permit [the] defendant to make effective use of that evidence at trial").  And if our analysis necessarily looks to what might have changed had the *Brady* evidence been disclosed before trial, then it would make no sense to account for evidence that was *not* available before trial.

Accordingly, we confine our analysis of favorability and materiality to the record before the state trial court.  We therefore cannot consider Pethel's confession and guilty plea, nor can we consider evidence Browning developed in post-conviction proceedings that he believes favors his theory of the case.

### C. "Favorable"

As noted, evidence is favorable if it is exculpatory or impeaching. *Banks*, 540 U.S. at 691. At oral argument, counsel for the State conceded that the State does not contest the favorability of Tackett's mental health records to Browning's case—and indeed it is beyond question that those records contain both exculpatory and impeaching evidence.

On the exculpatory side, her records describe her as hostile, assaultive, combative, and even potentially homicidal. Such evidence tends to show that a person with a motive to kill might even have a disposition to kill.

On the impeaching side, Tackett's psychiatric evaluations evinced, among other things, memory deficits, magical thinking, blurring of reality and fantasy, and projection of blame onto others. This is classic impeachment evidence. "A witness's credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired. Consequently, the witness's capacity at the time of the event, as well as at the time of trial, is significant." 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009); *see also Gonzalez v. Wong*, 667 F.3d 965, 983–84 (9th Cir. 2011) (recognizing impeachment value of mental health evidence); *United States v. Robinson*, 583 F.3d 1265, 1272 (10th Cir. 2009) (same); *Wilson v. Beard*, 589 F.3d 651, 666 (3d Cir. 2009) (same); *United States v. Butt*, 955 F.2d 77, 82–83 (1st Cir. 1992) (same).

Accordingly, we agree with the district court's disposition of the favorability question: "There is no reasonable argument or theory that could support the [Oklahoma courts'] conclusion that the sealed material contained nothing favorable to Browning's defense." R., Vol. 1 at 1133. We therefore turn to the question of whether Tackett's mental health records would have been material to Browning's case.

### D. "Material"

#### 1. Materiality Generally

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith*, 132 S. Ct. at 630 (internal quotation marks omitted). "A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (internal quotation marks omitted; alterations incorporated); *see also Kyles*, 514 U.S. at 435 (evidence is material for *Brady* purposes when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). In determining materiality, there is no distinction between exculpatory evidence and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("This Court has rejected any . . . distinction between impeachment evidence and exculpatory evidence [for *Brady* purposes].").

By rejecting Browning's materiality argument, the Oklahoma courts necessarily concluded that Tackett's mental health records—had they been available for use at trial—could not have put the trial in a "different light" and "undermine[d] confidence in the verdict." *Kyles*, 514 U.S. at 435. The question for our review is whether the Oklahoma courts reached that conclusion unreasonably. We agree with the district court that the Oklahoma courts' conclusion was unreasonable.

Tackett was the prosecution's indispensable witness, and all sides knew that Browning's fate turned on her credibility. In case that was not obvious to the jury, the prosecution made it abundantly clear at closing argument:

> First of all, ladies and gentlemen, they put Cenessa on trial. They put Cenessa on trial. Everywhere outside this courtroom, ladies and gentlemen, that this story is told, she is a hero. And for someone to get up here, who has not faced that situation, with a mom and a dad and a fire, having a baby inside of you, and to criticize them, that is uncalled for. She is a hero everywhere except this trial by defense counsel. Everywhere else, but there she's the villain. Make no mistake about it, that's what the strategy is here, is let's put her on trial.

R., Trial Tr., Vol. XIII at 2426.

If, as the prosecution told the jury at the time, Browning's only defense was to discredit Tackett—and this was really the only possible defense in light of her powerful eyewitness testimony—then it is difficult to see how the Oklahoma courts could reasonably conclude there was nothing material about a recent

-30-

diagnosis of a severe mental disorder that made her hostile, assaultive, combative, and even potentially homicidal, or that Tackett was known to blur reality and fantasy and project blame onto others.

### *2. Corroboration*

The State argues, however, that other evidence substantially corroborated Tackett's story. "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 132 S. Ct. at 630. But at least when the eyewitness testimony is "the *only* evidence linking [the defendant] to the crime," and the impeachment evidence casts substantial doubt upon its reliability, it is material. *Id*. (emphasis in original).

In *Smith*, the eyewitness's testimony was literally the only evidence linking the defendant to the crime. *Id*. at 629. That is not the case here. Specifically, two items of evidence against Browning did not rely solely on Tackett's testimony. First, when police contacted Browning several hours after the murders, he was wearing the clothing described by Tackett in her initial statement to police. Second, several witnesses saw Browning and Pethel together shortly before the crimes and one witness saw Browning and Pethel together at 4:20 a.m.—not long after Tackett's 911 call.

We agree with the State that this evidence circumstantially corroborates Tackett's story. But the existence of *some* corroborating evidence for Tackett's

testimony does not necessarily vitiate the materiality of her mental health records. Again, the *Brady* requirement of a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different . . . does not mean that the defendant would more likely than not have received a different verdict." *Smith*, 132 S. Ct. at 630 (internal quotation marks omitted). It means "only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (internal quotation marks omitted; alterations incorporated).

Given the obvious potential force of Tackett's mental health records, the Oklahoma courts could not reasonably conclude that the State's corroborating evidence was "strong enough to sustain confidence in the verdict." *Id.* The thrust of the psychiatric evidence is that Tackett is a very disturbed, perhaps even homicidal person, with a tendency to blur reality and fantasy and shift blame to others. That is the only evidence Browning could muster to place Tackett's testimony in a very different light, given the defense theory that she and Pethel wanted to frame Browning. Indeed, more than any other evidence that actually came out at trial, the mental health evidence would have given the jury reason to consider seriously Browning's theory of the case or at least to question Tackett's credibility.

With such consideration, a notably different light shines on the corroborating evidence. In particular, *because* Pethel and Browning were

-32-

together not long before the crimes, Tackett could have learned from Pethel what Browning had been wearing. That is consistent with Browning's conspiracy theory.

What is inconsistent—or seemingly so—is how events played out as to Pethel. Assuming Tackett and Pethel conspired, it is somewhat surprising that Tackett nonetheless identified Pethel as one of the perpetrators. And it is particularly surprising that Pethel, having been identified, would not point the finger back at Tackett. But Pethel was not a witness at Browning's trial and his motives therefore remain in the realm of speculation.

In any event, whether the jury necessarily would have reached an alternate conclusion is not the appropriate inquiry. We only inquire whether the Oklahoma courts could have reasonably decided that the mental health evidence would not have mattered. The answer is no. This evidence would have mattered, even in light of the State's corroborating evidence.

### 3. Causation

The State further contends that Tackett's mental health diagnosis— which came eight months after the murders—is best explained as a result of this crime, not a cause. But nothing in the record explains whether Tackett's symptoms could have resulted from living through a nightmare like that described here or from some other earlier cause. Nonetheless, as demonstrated by the Supreme Court's recent *Smith* decision, that theory is not enough to undermine the

materiality of Tackett's mental health records.

In *Smith*, the defendant was convicted of murder based on the eyewitness testimony of a man named Boatner. *Smith*, 132 S. Ct. at 629. The defendant learned after trial that, shortly after the murders, Boatner had informed a police detective that he (Boatner) "'could not ID anyone because [he] couldn't see faces' and 'would not know them if [he] saw them.'" *Id*. at 630 (quoting appellate record) (alterations in original). In habeas briefing, the prosecution argued that such statements would not have been material because they could "be explained by fear of retaliation." *Id*. at 630. In granting relief to the defendant, the Supreme Court rejected this argument, explaining that it "offers a reason . . . the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so." *Id*. (emphasis in original).

Here, the State's argument similarly gives us a reason only to think that the jury could discount the significance of Tackett's mental health, not that it would discount it. Nevertheless, the State presses forward, arguing that the lack of evidence showing Tackett suffered from psychiatric problems on the day of the murders makes the evidence of subsequent psychiatric problems irrelevant. This is actually an argument against favorability, not materiality. If, as the State suggests, psychiatric evidence is irrelevant unless it shows impairment on the day of the events testified to, then Tackett's mental health records are not even favorable, rendering the materiality question moot. But the State confirmed at

oral argument that it does not contest favorability, and it cannot have it both ways. And in any event, as already explained, impeachment evidence is favorable evidence, and a witness's condition both at the time of the events testified to and the time of the testimony is relevant to impeachment. *See* Part III.C, *supra*.

## IV. Conclusion

*Brady* evidence need not prove a defendant's innocence. Rather, the evidence need only "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. That circumstance exists here, and the Oklahoma courts could not have reasonably concluded otherwise. Browning's only chance was to impeach Tackett's credibility and portray her as a participant in the crime. As the trial actually played out, there was little reason for the jury to give Browning's theory any credence. Indeed, the prosecution encouraged the jury to take offense that Browning would propose such an idea. But that dynamic would have been significantly curtailed had Browning been able to inform the jury that Tackett blurs reality and fantasy, projects blame onto others, and is perhaps even homicidal. A theory that might otherwise be offensive suddenly must be taken seriously. That, if anything, is "such a different light as to undermine confidence in the verdict." *Id*.

The district court's grant of a conditional writ of habeas corpus is AFFIRMED.