IN THE SUPREME COURT OF NORTH CAROLINA

No. 300A93-3

Filed 18 December 2020

STATE OF NORTH CAROLINA

v.

NORFOLK JUNIOR BEST

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order entered on 23 January 2018 by Judge Douglas B. Sasser, Sr. in Superior Court, Bladen County denying defendant's motion for appropriate relief. Heard in the Supreme Court on 1 September 2020.

*Joshua H. Stein, Attorney General, by Jonathan P. Babb, Special Deputy Attorney General, for the State-appellee.*

*Thomas, Ferguson & Mullins, LLP, by Jay H. Ferguson, and Center for Death Penalty Litigation, by Ivy A. Johnson, for defendant-appellant.*

EARLS, Justice.

In December 1991, the bodies of an elderly couple, Gertrude and Leslie Baldwin, were found in their home in Whiteville, North Carolina. The couple had been beaten, stabbed, and apparently robbed. Norfolk Junior Best, the defendant in this case, was indicted for first-degree burglary, first-degree rape, robbery with a dangerous weapon, and two counts of first-degree murder. Following a jury trial, he was convicted of all counts and sentenced to death. His conviction was affirmed on direct appeal by this Court. *State v. Best*, 342 N.C. 502, 467 S.E.2d 45 (1996).

In postconviction proceedings, it became clear that the State failed to produce certain pieces of evidence to Mr. Best prior to the 1993 trial. Instead, the evidence was, in part, voluntarily provided to Mr. Best's postconviction counsel in 2011. Later that year, postconviction counsel located additional evidence in the attic of Whiteville City Hall. After the additional evidence was produced and uncovered, Mr. Best filed a motion for appropriate relief arguing, *inter alia*, that the State's failure to disclose exculpatory evidence was a violation of his right to due process pursuant to the United States Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). The trial court denied the motion, concluding that Mr. Best had not shown prejudice.

Mr. Best claims, and the State denies, that the undisclosed evidence was material to his guilt such that he was prejudiced by the State's failure to produce it. Mr. Best argues, and the State denies, that had the evidence been disclosed, there is a reasonable probability that the outcome of his trial would have been different. We conclude that the undisclosed evidence was material. It was reasonably probable that, had it been disclosed to Mr. Best prior to trial, the outcome would have been different. Therefore, we reverse the trial court's denial of Mr. Best's motion for appropriate relief, remanding with instructions to grant the motion and order a new trial.

Background[1]

Prior to trial, Mr. Best had requested discovery from the State several times regarding the case against him. On 20 December 1991, Mr. Best filed a motion for discovery requesting, *inter alia*, the following:

> 6.   To permit the defendant to inspect and copy or photograph books, papers, documents, photographs, motion picture, mechanical or electronic recordings, tangible objects, or copies or portions thereof which are within the possession, custody, or control of the State and which are material to the preparation of this defendant's defense, which the State intends to use as evidence at defendant's trial or which were obtained from or belong to the defendant (G.S., 15A-903(d);

> 7.   To provide a copy or permit the defendant or his attorney to inspect and copy or photograph results or reports of physical or mental examinations or of tests, measurements or experiments made in connection with this case, or copies thereof, within the possession, custody, or control of the State, the existence of which is known or by the exercise of due diligence may become known to the prosecutor (G.S. 15A-903(e);

> 8.   The District Attorney is also given notice that these requests are continuing, and the State is under a duty to disclose any of the requested material promptly to the defendant or his attorney if discovered or the State decides to use it at the captioned defendant's trial (G.S. 15A-907);

---

[1] The State does not dispute that the evidence identified by Mr. Best was not disclosed prior to trial, arguing instead that Mr. Best has not shown that there is a reasonable probability that the undisclosed evidence affected the outcome of Mr. Best's trial. We note this only to emphasize our sensitivity to the principle that "[f]act finding is not a function of our appellate courts." *Godfrey v. Zoning Bd. of Adjustment*, 317 N.C. 51, 63, 344 S.E.2d 272, 279 (1986). If there was a factual dispute to be resolved in this case, the appropriate remedy would likely be to remand to the trial court for an evidentiary hearing.

On 12 March 1992, Mr. Best filed a motion (dated 7 January 1992) seeking to inspect, examine, and test physical evidence in the State's control. On the same date, remarking that the 20 December 1991 request had gone unanswered, Mr. Best filed a motion to compel the State to produce discovery. The motion to compel specifically requested test results, exculpatory information, and potentially favorable evidence. After being told that the District Attorney had an "open file policy," defense counsel attempted on 19 March and 20 March 1992 to review Mr. Best's file at the District Attorney's office, but in both instances was told that the file was unavailable. On 2 April 1992, the District Attorney provided defense counsel with discovery, and continued to produce materials until shortly before trial.

Although the file stamps are unclear, it appears that Mr. Best filed two more discovery requests on 24 June and 16 September 1992. In the first, Mr. Best requested DNA test results from samples referenced in a report that had been produced to him. In the second, he requested information relevant to the reliability of the DNA testing expected to be offered as evidence during trial.

In the preliminary statement that appears before our decision on Mr. Best's direct appeal, the evidence presented at trial was described as follows:

> The defendant was tried on two charges of first-degree murder and one charge each of first-degree burglary, robbery with a dangerous weapon, and first-degree rape. The State's evidence showed that Leslie Baldwin and his wife, Gertrude Baldwin, were eighty-two and seventy-nine years of age, respectively. They were killed in their home

during the night of 30 November [1991]. Earlier that day, the defendant had done yard work for them.

Mr. Baldwin died as a result of the cutting of his carotid artery, and Mrs. Baldwin died of blunt-force trauma to the head. Money was missing from Mr. Baldwin's wallet and from Mrs. Baldwin's purse. The defendant's DNA matched one of the semen samples taken from Mrs. Baldwin, and his fingerprint matched one on a paring knife found beside Mr. Baldwin's body. The defendant bought between $700 and $1,000 worth of crack cocaine within two days after the killings.

*Best*, 342 N.C. at 508–09, 467 S.E.2d at 49–50.

The Baldwins were discovered dead in their home on Tuesday, 3 December 1991. At trial, the State presented evidence that the Baldwins were robbed of several hundred dollars, killed in their home, and that Mrs. Baldwin had been raped. The couple's daughter testified that Mrs. Baldwin, who took various medications, filled her pillbox regularly each Thursday. The medicine in the pillbox was arranged by time of day, as well as day of the week. Based on the slots that were filled with medicine in the pillbox, the couple's daughter testified that Mrs. Baldwin had last taken her medication at 11:00 p.m. on Saturday, 30 November 1991. The couple's daughter also testified that Mr. Baldwin habitually turned on a light in the kitchen before retiring to bed. The light was discovered to be on in the kitchen. Similarly, she testified that Mr. Baldwin, by routine, retrieved and read the newspaper every morning, and that it was the first thing he did after rising, getting dressed, and taking his medicine. When the Baldwins' bodies were discovered, the papers for Sunday, 1 December; Monday, 2 December; and Tuesday, 3 December 1991 were all laying on

the front porch. The State points to this evidence as support for the conclusion that the deaths occurred in the late evening of Saturday, 30 November 1991. A witness for the State testified that she was with Mr. Best at a night club beginning at 12:30 a.m. or 1:00 a.m. on 1 December 1991.

At trial, the State also tendered evidence that Mr. Best was the perpetrator. The trial evidence identified by the State consists of (1) a latent bloody fingerprint, matched to Mr. Best, found on the blade of a paring knife which was lying near Mr. Baldwin's body; (2) the results of a DNA test showing that sperm found in Mrs. Baldwin's vagina was a partial match to Mr. Best, and that the probability of another unrelated person matching the tested profile was "approximately 1 in 459 for the North Carolina white population, 1 in 18 for the North Carolina black population,[2] and 1 in 484 for the North Carolina Lumbee population;" and (3) testimony from Tammy Rose Smith that Mr. Best spent one or two hundred dollars on cocaine in the early morning hours of 1 December 1991, and from Carolyn Troy that Mr. Best spent several hundred dollars on cocaine during the evening of 2 December 1991.

At the trial's conclusion, Mr. Best was convicted and sentenced to death. After we affirmed the conviction, Mr. Best sought postconviction relief. He filed a motion for appropriate relief in August 1997, which the trial court denied in April 1998. We denied certiorari review. *State v. Best*, 349 N.C. 365, 525 S.E.2d 179 (1998).

---

[2] Mr. Best is African-American.

In March and August of 2011, the State voluntarily produced parts of its file to Mr. Best's new postconviction counsel. After defense counsel filed a motion seeking complete discovery pursuant to N.C.G.S. § 15A-1415(f), defense counsel discovered additional evidence "in a storage room in the attic of the Whiteville City Hall." The following evidence arose in postconviction discovery:

**Undisclosed Forensic Evidence**

At trial, a witness for the State testified that hairs were collected from the crime scene. Further, testimony established that, in addition to Mr. Best, head and pubic hair samples were collected from two other suspects, Eddie Best and Daniel Blanks, and from Mr. and Mrs. Baldwin. The hair was analyzed. At trial, Mr. Best's counsel attempted to elicit that none of the hairs had been identified as coming from a Black person but was unable to cross-examine the witness on the findings of a non-testifying expert. However, the State never disclosed that more than 70 hairs collected from the crime scene, found on Mrs. Baldwin's arm, in her pubic hair combings, and beneath Mr. Baldwin's fingernails, were identified as Caucasian and were not a match to anyone who was tested.

At trial, a witness for the State testified that tapings from the crime scene were taken and tested for trace hair and fiber evidence. The State did not disclose, however, that a fiber comparison analysis was conducted between (1) a number of items, including various items of clothing and shoes, from Mr. Best's home and person; and (2) various items from the crime scene, including bedding, tapings,

clothing, fingernail scrapings, a place mat, and carpeting. The results of the undisclosed comparison were that no association was found between Mr. Best's effects and the items from the crime scene.

As discussed previously, Mr. Best's fingerprint was located on a paring knife that was lying next to Mr. Baldwin's body at the crime scene. Lab notes which had not been disclosed prior to trial contained the following statement pertaining to the possible fingerprint: "The ridge detail on item #4 was examined & determined to be of no value @ this time however; major case inked impressions will be needed in order to effect any kind of conclusive comparison."

At trial, witnesses for the State testified that blood remnants were found as a result of luminol testing "on the carpet in Gertrude Baldwin's bedroom and in the hallway" near where Mr. Baldwin was found. Another witness testified that she tested a pair of Mr. Best's shoes and determined that they did not have blood on them. Undisclosed lab notes indicated that the luminol tests had revealed shoe tracks of blood residue, about which the witness did not testify and of which defense counsel was not aware.

**Undisclosed Witness Interviews**

As discussed previously, Carolyn Troy testified at trial that Mr. Best spent hundreds of dollars during the evening of 2 December 1991, near the time that the State believes the Baldwins were robbed and murdered. However, the State did not

disclose Ms. Troy's initial witness interview, during which Ms. Troy stated that she was with Mr. Best at the time, but that he only had $30 to $40 on him.

**Other Evidence**

The evidence at trial also indicated that the assailant broke a pane of glass to enter the home. A lab report discussing the analysis of the glass indicated that clothing and two pairs of shoes from Mr. Best did not have any glass that matched the glass collected from the crime scene—although one of the pairs of shoes showed glass particles which did not match the glass from the crime scene. The record includes an affidavit from Mr. Best's trial counsel indicating that the report was included in postconviction discovery, and had not been previously disclosed to trial counsel.

The State also did not disclose that three one-hundred-dollar bills were found in a money holder in Mrs. Baldwin's purse.

**Undisclosed Alternate Suspects**

Finally, the State failed to disclose evidence regarding two alternate suspects: Ricky Winford and Destene Harris.

*Ricky Winford*

The State's 2011 disclosures contained a number of documents relating to Ricky Winford, an alternate suspect in the crime. Interview notes suggest that a woman called police on the evening of 4 December 1991 to report that, on the morning of 3 December 1991, someone named "Rick" was driving around the Baldwins'

neighborhood without lights. The driver drove up and down the street three or four times until someone exited the car and walked away. The car drove off and returned about forty-five minutes later, at which time a friend of the woman's asked the driver what he was doing. The driver stated that he was looking for a friend. This occurred before the Baldwins' bodies were discovered. Police ran the license plate and connected the vehicle to someone named Gary Clayton Derrick, who apparently knew Mr. Winford. Mr. Derrick reported that Mr. Winford had stolen his car and taken off, and later reported speaking with a third person, Janet. The notes indicate that Mr. Winford told Janet "that he had killed some people in Whiteville." In a record of a phone interview, Mr. Derrick reported that Winford had previously bragged about killing people, had previously committed burglaries, and had once pulled a knife on Derrick.

*Destene Harris*

The State's 2011 disclosures also included a number of documents pertaining to Destene Harris. According to a 5 December 1991 report from Alice Cooke, Mr. Harris threatened to kill some "old farts" that lived hear him. He apparently also often carried a knife. Ms. Cooke also reported that, on 2 December 1991 (a Monday), she had heard Mr. Harris state that he had killed two "old farts" over the weekend. Mr. Harris was incarcerated in Alamance County from 29 November until 3 December 1991.

Mr. Best filed the instant motion, his second motion for appropriate relief, on 16 January 2014. He argued (1) that the State withheld exculpatory evidence in violation of his constitutional rights established in *Brady* and its progeny; (2) that the State misled the jury as to the victims' time of death, or, in the alternative, that his trial counsel was ineffective for failing to refute the State's theory on time of death; and (3) that the State misled the jury as to the reliability of the DNA evidence it presented against him, or, in the alternative, that his trial counsel was ineffective for failing to refute the DNA evidence. Because we determine that Mr. Best's *Brady* claim is meritorious, we need not address the remaining claims.

As to Mr. Best's claim that he is entitled to a new trial due to the State's failure to disclose favorable evidence, the superior court made the following conclusions of law:

> 7.    In his MAR2 Claim I, Best claims that he is entitled to a new trial because the state wrongfully concealed exculpatory evidence regarding (a) two alternate suspects[,] (b) exculpatory forensic testing results[,] and (c) key evidence undermining its theory of motive and identity.
>
> 8.    Best has failed to show the existence of the asserted ground for relief. N.C. Gen[.] Stat. § 15A-1420(c)(6); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>State v. Strickland</u>, 346 N.C. 443, 488 S.E.2d 194 (1997).
>
> 9.    In the present case there was overwhelming evidence at trial against defendant and none of the alleged <u>Brady</u> material would have amounted to a reasonable probability of a different result. Therefore, defendant's <u>Brady</u> claim must fail. <u>Strickland</u> at 457, 488 S.E.2d at 202.

10. In post-conviction, the overwhelming evidence presented at trial was not refuted or weakened. Instead the post-conviction DNA removed any doubt, reasonable or unreasonable, of defendant's guilt. Both experts testified in post-conviction that the sperm fraction, not the skin fraction, taken from the rape/murder victim was an exact match for defendant's DNA profile. (See 11 April 2016 Post-conviction hearing transcript pp. 56 [testimony of Maher Noureddine] and 68 [ testimony of Mark Boodee].)

11. Given the evidence showing defendant's guilt presented at trial, none of the complained of evidence in Claim I, if turned over could have amounted to a reasonable probability of a different result. Additionally, the post-conviction DNA testing results further illustrate the lack of any possible prejudice.

12. As this Court can determine from the motion and any supporting or opposing information presented that this claim is without merit, an evidentiary hearing is not necessary to decide the issues raised in this claim. N.C. Gen. Stat. § 15A-1420(c)(1) and State v. McHone, 348 N.C. 254, 257, 499 S.E.2d 761, 762-63 (1998), cert. denied, 528 U.S. 1095, 120 S. Ct. 835, 145 L. Ed. 2d 702 (2000).

Mr. Best petitioned for a writ of certiorari to this Court, which we allowed.

Standard of Review

The trial court denied Mr. Best's motion for appropriate relief without an evidentiary hearing, deciding that it could "determine from the motion and any supporting or opposing information presented that this claim is without merit." *See* N.C.G.S. § 15A-1420(c)(1) (2019) (permitting a trial court to forgo an evidentiary hearing on a motion for appropriate relief if "the court determines that the motion is without merit"). Because the trial court did not make findings of fact, instead concluding that Mr. Best was not entitled to relief as a matter of law, our review of

the trial court's decision is de novo. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011) ("Conclusions of law are reviewed de novo and are subject to full review.").

<u>Analysis</u>

The State violates the federal constitution's Due Process Clause "if it withholds evidence that is favorable to the defense and *material* to the defendant's guilt or punishment." *Turner v. United States*, 137 S. Ct. 1885, 1888 (2017) (quoting *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630 (2012)). However, not every failure to disclose violates the Constitution. Instead, "prejudicial error must be determined by examining the materiality of the evidence." *State v. Tirado*, 358 N.C. 551, 589, 599 S.E.2d 515, 540 (2004) (quoting *State v. Howard*, 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993)). To establish prejudice on such a claim, often referred to as a *Brady* claim,[3] a defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985)).

A reasonable probability is one "sufficient to undermine confidence in the outcome" of the proceeding. *State v. Byers*, 375 N.C. 386, 400, 847 S.E.2d 735, 741 (2020) (quoting *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (2006)). The

---

[3] *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

defendant's burden to show a reasonable probability is less than that for showing a preponderance. *Smith*, 565 U.S. at 75, 132 S. Ct. at 630 ("A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." (cleaned up)); *accord Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565–66 (1995). However, a reasonable probability is more than a mere possibility. *Strickler v. Greene*, 527 U.S. 263, 291, 119 S. Ct. 1936, 1953 (1999). A defendant's burden, then, on a *Brady* claim, is more than showing that withheld evidence might have affected the verdict, but less than showing that withheld evidence more likely than not affected the verdict. When we consider whether there was a reasonable probability that the undisclosed evidence would have altered the jury's verdict, we consider "the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402 (1976).

While we review the entire record, we need not consider every piece of undisclosed material evidence identified by the defendant. Where any portion of the evidence "alone suffice[s] to undermine confidence in [the defendant's] conviction, we have no need to consider his arguments that the other undisclosed evidence also requires reversal under *Brady*." *Smith*, 565 U.S. at 76, 132 S. Ct. at 631. As a result, any piece of undisclosed evidence, if sufficiently material to undermine confidence in the outcome of the trial, is sufficient to satisfy the defendant's burden on a *Brady* claim.

The question that we must answer when deciding such a claim is not whether the defendant is guilty or innocent, but whether he received a fair trial in accordance with the requirements of due process. *See Brady*, 373 U.S. at 87, 83 S. Ct. at 1196–97 (holding that nondisclosure of favorable evidence to the defense violates due process). As a result, we cannot, and do not here, consider new evidence produced after conviction which may tend to support or negate either guilt or innocence.[4] After a thorough review of the record, and consideration of the arguments of the parties, we are convinced that Mr. Best has met his burden.

According to the State, the principal evidence presented at trial which proved Mr. Best's guilt consisted of: (1) Best's fingerprint on a paring knife; (2) the partial DNA match between Mr. Best and the semen found in Mrs. Baldwin's vagina; and (3) testimonial evidence that the Baldwins had been robbed, and that Mr. Best was

---

[4] The State refers at various points in its brief to the results of a postconviction DNA test which Mr. Best requested pursuant to N.C.G.S. § 15A-269. results indicated an exact match between Mr. Best's DNA profile and that of a sperm fraction recovered from a vaginal swab of Mrs. Baldwin's body. While this result may be relevant to subsequent proceedings designed to prove Mr. Best's guilt or innocence, that is not the question before us now. Instead, we must decide whether Mr. Best's *original trial*, which took place in 1993, was procedurally fair. *See United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985) ("[A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome *of the trial*." (emphasis added)); *see also id.* at 699, 105 S. Ct. at 3392 (Marshall, J., dissenting) ("[The Court] defines the right . . . by reference to the likely effect the evidence will have on the outcome of the trial."). Because the postconviction DNA test result identifying Mr. Best did not exist until decades after the trial took place, it could not have affected the outcome of the trial. As a result, we do not consider it here. We note also defense counsel's assertions that the test sample may have been contaminated—although, again, the test result does not factor into our analysis.

spending large amounts of money on drugs around the time of the murders. This evidence was strong enough at trial for the jury to have convicted Mr. Best. However, upon consideration of the undisclosed evidence, the case is far less compelling.

Regarding the assertion that Mr. Best was spending large sums of money around the time of the murders, the State relied upon the testimony of both Carolyn Troy and Tammy Rose Smith. The State's undisclosed witness interview of Carolyn Troy, in which she stated that Mr. Best had only thirty or forty dollars on him on the night of 2 December 1991, would have permitted Mr. Best to impeach Ms. Troy's testimony. In addition to directly contradicting what Ms. Troy testified to at trial, the fact that Ms. Troy's story had changed over time, if admitted to at trial, could have been used by Mr. Best to impeach her credibility. We have previously stated that "exculpatory evidence is evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed, . . . including impeachment evidence." *State v. Lewis*, 365 N.C. 488, 501, 724 S.E.2d 492, 501 (2012) (cleaned up). Ms. Troy was the principal witness testifying to what the State identifies as a principal piece of evidence—namely, that Mr. Best was spending the money stolen from the Baldwins.

The State argues that the undisclosed witness interview is not material because another witness, Tammy Rose Smith, testified that Mr. Best was spending money on 1 December 1991. However, according to the State, Ms. Smith testified that Mr. Best spent about two hundred dollars, and may have also paid for a hotel room.

This is a far cry from the $1,800 that the State claims were stolen from the Baldwins. More importantly, it is a significant departure from the testimony of Ms. Troy, who testified at trial that she saw Mr. Best with $300 and saw him purchase $750 to $900 worth of drugs during the late night of Monday, 2 December 1991 and early morning of Tuesday, 3 December 1991. The State cannot credibly claim that the evidence undermining the testimony of Ms. Troy, who claimed that Mr. Best used over $1000 to buy drugs, is inconsequential because another witness testified that Mr. Best had about $200 and paid for a hotel room.[5]

While the other evidence identified by Mr. Best does not directly refute the DNA and fingerprint evidence presented at trial, it does undermine its persuasive effect. For example, because the State failed to disclose the lab notes for the luminol tests conducted in the Baldwins' home, the jury did not learn that the State found "shoe tracks" in the hallway and kitchen areas, suggesting that the assailant left bloody footprints during the attack. This increases the exculpatory relevance of the testimony, presented at trial, that Mr. Best's shoes were tested and found to be devoid

---

[5] The dissent refers to three additional persons who might have, but did not, testify that Mr. Best was spending money around the time the State argued the Baldwins were murdered. However, the question before us is whether there is a reasonable probability that the result of the proceeding would have been different if the undisclosed evidence had been provided to the defense. *State v. Tirado*, 358 N.C. 551, 589, 599 S.E.2d 515, 540 (2004). As a result, we cannot speculate as to what evidence the State could have, but did not, put on. We must instead look to the record of the proceeding as it exists, and determine whether there is a reasonable probability that the outcome of *that* proceeding, rather than a hypothetical proceeding with stronger evidence from the State, would have changed with the undisclosed evidence. *Cf. Browning v. Trammell*, 717 F.3d 1092, 1105 (10th Cir. 2013) (confining *Brady* analysis "to the record before the state trial court").

of blood. Had these pieces of evidence been presented together, it is more likely that the jury may have concluded that Mr. Best was not in the home during the murders. Similarly, due to the State's failure to disclose, the jury never learned that the State had discovered 70 Caucasian hairs on the bodies of the victims which were not yet matched to anyone in the case. Mr. Best could have easily pointed out at trial that, as a Black man, he could not have left those hairs on the victims' bodies and underneath the fingernails of Mr. Baldwin. It also does not appear from the lab notes that the hairs were tested to see if they matched Ricky Winford. We do not conclude or suggest that this proves Mr. Best's innocence. Instead, we conclude only that this evidence creates a reasonable probability that the jury would have returned a different verdict had it been presented with the undisclosed evidence. *See Tirado*, 358 N.C. at 589, 599 S.E.2d at 540 (stating that establishing prejudice requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383)); *see also Smith*, 565 U.S. at 75, 132 S. Ct. at 630 ("A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." (cleaned up)).

Not all of the withheld evidence described by Mr. Best is material. Mr. Best makes much in his brief of a statement in the fingerprint analyst's lab notes that

"[t]he ridge detail on [the knife] was examined & determined to be of no value." As the State correctly points out, Mr. Best ignores the rest of the sentence, which clarifies that the ridge detail is not of value "[at] this time" and that a conclusive comparison will require "major case inked impressions." As to Mr. Best's fingerprint on the knife, then, the evidence highlighted by Mr. Best does not undercut the reliability of the fingerprint identification.

That being said, the evidence against Mr. Best is not as strong as the State claims it is. The State's evidence establishes that Mr. Best touched the knife while he had blood on his finger—Mr. Best testified at trial that he was using the knife to clean the gutters, which he had been hired to do that day, and had scraped the backs of his hands. While the dissent claims that the fingerprint on the knife consisted of Mr. Baldwin's blood, this claim is unsupported by the record.[6] While the jury certainly did not have to believe Mr. Best's testimony, the existence of a ready explanation for the fingerprint on the knife undermines the State's argument that the fingerprint is such overwhelming evidence so as to render harmless the State's failure to disclose other exculpatory evidence.

---

[6] It appears that the dissent takes a stray statement from the State's brief and attempts to create a factual dispute in the evidence regarding the source of the blood that made up the fingerprint on the knife. Contrary to the dissent's assertion, the State's brief claims only that the knife had Mr. Baldwin's blood on it, not that the fingerprint was composed of Mr. Baldwin's blood. It is unsurprising that the State made no such claim, as Special Agent Lucy Milks, testifying for the State at Mr. Best's trial, stated that she tested the blood from the fingerprint and was able to determine only that it was blood—she was unable to determine a blood type, or even whether it was animal or human blood.

Finally, the State relies on the partial DNA match between Mr. Best and the semen recovered from Mrs. Baldwin. However, this evidence is similarly underwhelming. The State's expert testified that, regarding the reliability of the DNA match, one out of every eighteen African-American men would match the sample recovered from Mrs. Baldwin. To put that into perspective, out of every 90 African-American men, five would match the sample, but at least four of them would not be the actual source of the DNA sample. Typically DNA evidence is significantly more compelling. *See, e.g.*, *State v. Honeycutt*, 235 N.C. App. 656, 764 S.E.2d 699 (2014) (stating that a DNA analysis of the victim's bedsheet indicated "a DNA match probability with defendant of one in 730 billion Caucasians, and her rape kit had a match probability with defendant of one in 36.2 billion Caucasians" and that another victim's "rape kit was consistent with defendant with a match probability of one in 16.2 million Caucasians"). Where, here, the DNA evidence presented at trial indicated that the tested DNA sample would match one out of every eighteen African-American men, we conclude that it is not nearly the overwhelming evidence that the State suggests it is.

While it is not relevant to our analysis on Mr. Best's *Brady* claim, Mr. Best also raised a claim of ineffective assistance of counsel which casts doubt on the State's timeline of events. At trial, the State relied upon the testimony of the Baldwins' daughter to establish that, based on the contents of Mrs. Baldwin's pillbox, the presence of newspapers on the Baldwins' front porch, and the fact that a light in the

kitchen was on which Mr. Baldwin habitually turned on before retiring to bed, the Baldwins had been killed after 11 p.m. on 30 November 1991 and before Mr. Baldwin would have normally awoken the following morning. The State also presented testimony that Mr. Best was out at a nightclub at approximately 12:30 a.m. or 1:00 a.m. on 1 December 1991. The State, in its brief, argues that the killings must have occurred between 11:00 p.m. on 30 November 1991 and 12:30 a.m. on 1 December 1991:

> To sum up – all the physical evidence at the crime scene indicated the victims were killed after 11:00 p.m. Saturday night and before Mr. Baldwin went to bed, and certainly before the next morning. At some point between 12:30 am Sunday morning and 1:00 a.m. Sunday morning defendant was seen paying for hotel rooms, beer, and drugs with cash. Ms. Smith was called by defendant at trial and was the witness who testified about the large amount of cash spent by defendant after midnight Saturday night.

Mr. Best argued that effective trial counsel would have challenged this timeline, pointing out that the State's theory that Mr. Best killed the Baldwins required that the crime occur during an exceedingly narrow window of time, unsupported by expert testimony as to time of death. Mr. Best points to medical evidence gathered after conviction by postconviction counsel, which suggests the Baldwins did not die during the narrow window of time posited by the State. While the dissent views the State's evidence on this point as persuasive, the combination of (1) no medical evidence confirming the State's timeline and (2) the postconviction medical evidence suggesting that the State's timeline was inaccurate confirms our independent view

that the State's evidence presented at trial was weak enough that there is a reasonable probability of a different outcome if the State had disclosed the exculpatory evidence.

We are not considering and do not decide whether Mr. Best received effective assistance of counsel during his original trial. Further, we cannot and do not decide that the production of this additional evidence postconviction supports a reasonable probability that the jury in Mr. Best's trial would have come to a different result if presented with evidence that the State failed to disclose. Instead, we mention Mr. Best's ineffective assistance of counsel claim, and the evidence supporting it, only to underscore the weakness of the State's case at trial, and the likelihood that the jury may have decided to acquit if it had been presented with all of the evidence.

Our decision is based upon Mr. Best's claim that the State failed to disclose material exculpatory evidence. We are sufficiently disturbed by the extent of the withheld evidence in this case, and by the materiality of that evidence, that it undermines our confidence in the jury's verdict. The exculpatory evidence withheld by the State for approximately twenty years was material. It either negated or cast doubt upon the principal evidence presented by the State at Mr. Best's trial. For that reason, we are of the opinion that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Tirado*, 358 N.C. at 589, 599 S.E.2d at 540.

We have not discussed all of the evidence which the State failed to disclose, but "we have no need to consider [Mr. Best's] arguments that the other undisclosed evidence also requires reversal under *Brady*." *Smith*, 565 U.S. at 76, 132 S. Ct. at 631. The undisclosed witness interview of Carolyn Troy and the undisclosed forensic evidence, particularly the unidentified Caucasian hairs and luminol test notes indicating the presence of bloody shoe tracks, are sufficiently material. When considered against the facts that (1) the State relied heavily on the testimony of Ms. Troy that Mr. Best was spending the proceeds of the robbery on drugs; (2) Mr. Best is not white and could not have contributed the "Caucasian" hairs recovered from the crime scene, while no "Negroid" hairs were recovered; and (3) Mr. Best's shoes were tested and revealed no traces of blood, there is a reasonable probability that the jury would have returned a different verdict if presented with the undisclosed evidence.

## Conclusion

We have not decided today that Mr. Best is guilty or innocent, that the district attorney was right or wrong to charge him, or that Mr. Best should be convicted or acquitted on retrial. Instead, our review of the record in this case shows that the failure to disclose exculpatory evidence prejudiced Mr. Best's ability to present a defense. Every criminal defendant in this state is entitled to a fair trial with full opportunity to confront the evidence against him and to attempt to rebut the charges of which he is accused. The state and federal constitutional guarantees of due process require that the State turn over favorable evidence that is material to the defendant's

guilt or punishment prior to trial. That did not happen in this case. Accordingly, we reverse the superior court's denial of Mr. Best's motion for appropriate relief and remand this case to the Superior Court, Bladen County, with instructions to grant the motion and order a new trial.

REVERSED AND REMANDED.

Justice ERVIN did not participate in the consideration or decision of this case.

Justice NEWBY dissenting.

The issue in this case is whether evidence that the State presumably should have disclosed before defendant's trial under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), creates a reasonable probability of a different outcome of that trial. Because the undisclosed evidence is not sufficient to undermine the substantial evidence of defendant's guilt presented at trial, any *Brady* violation did not meet the standard of being prejudicial to defendant. The majority inflates the significance of vague undisclosed evidence and improperly minimizes the weight of the State's strong evidence presented at trial. The majority seems to find facts, weighing conflicting evidence in the light most favorable to defendant. The decision of the superior court denying defendant's motion for appropriate relief should be affirmed. I respectfully dissent.

Due process guards a defendant's right to a fair trial free from prejudicial error. The State may deprive a defendant of due process when it fails to disclose evidence that is favorable to the defendant and material to the defendant's guilt or punishment. *Smith v. Cain*, 565 U.S. 73, 75, 132 S. Ct. 627, 630 (2012). As the majority notes, however, not every failure to disclose amounts to a constitutional violation. Instead, a defendant also must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct.

3375, 3383 (1985).

The following evidence presented at trial supported defendant's conviction and sentencing: Eighty-two-year-old Leslie Baldwin met defendant at a gas station the evening of 29 November 1991. The details of their encounter are unclear, but the evidence shows that Mr. Baldwin hired defendant to perform yard work for him the next day. Defendant walked to the home of Mr. Baldwin and his wife, seventy-nine-year-old Gertrude Baldwin, on 30 November 1991. He performed yard work, including cleaning the gutters. Mr. Baldwin fed him lunch. At the completion of defendant's work, Mr. Baldwin paid him $30.

Mr. and Mrs. Baldwin were then murdered—Mr. Baldwin by a cut to his carotid artery on his neck and other trauma and Mrs. Baldwin by blunt force trauma to her head and multiple knife wounds. The State put on substantial evidence that the murders occurred the night of defendant's work at the victims' home. Specifically, testimony indicated that Mrs. Baldwin's niece spoke to her on the phone at 7:00 p.m. that evening and that Mrs. Baldwin's medication dose, which she habitually took at 11:00 p.m. before going to bed, was gone when the bodies were later discovered. Testimony also showed that the 1 December 1991 newspaper, which Mr. Baldwin typically would have retrieved by around 5:00 a.m. that day, was still on the front porch, along with the papers for the following few days. Thus, evidence showed that the Baldwins were likely killed late at night on 30 November 1991 or very early in the morning on 1 December 1991.

Mrs. Baldwin was also raped, and the evidence at trial showed a DNA sample taken from her vaginal swab matched defendant's DNA.[1] A paring knife found at the crime scene, under Mr. Baldwin's body and covered in his blood, bore a fingerprint in the blood that matched defendant's print.

Defendant claimed that the bloody print came from him using a similar knife to clean gutters, and that during that process, he scraped the back of his hand. Defendant alleges that the scrapes on the back of his hand would have produced the blood for the fingerprint later found on the knife. But defendant's testimony is undermined by the fact that his bloody fingerprint was placed on the pairing knife since it was last washed. Further, testimony indicated that the paring knife was typically stored in a kitchen drawer and that Mr. Baldwin never used kitchen utensils for yard work.

The Baldwins were also robbed of between one and two thousand dollars cash, some of which consisted of one-hundred-dollar bills. Witness testimony indicated that defendant possessed several one-hundred-dollar bills after the murders, spent one hundred dollars on cocaine just hours after the murders, and spent several hundred dollars more on cocaine within a couple days of the murders. When defendant filed this motion for appropriate relief over twenty years later, alleging certain evidence

---

[1] The DNA test ruled out about a 99.7% of unrelated members of North Carolina's Caucasian population, about 99.7% of the Lumbee population, and about 94.4% of the Black population. A second DNA test conducted at defendant's request showed a 100% match to defendant. While not considered in this *Brady* analysis, the second DNA test further confirms the reliability of the first test.

not disclosed before trial could have been used for his benefit, the superior court determined any nondisclosed evidence could not create a reasonable probability that the evidence's disclosure would have produced a different result. The superior court thus denied his motion.

The majority reverses that decision and awards defendant a new trial nearly thirty years after this tragedy. It does so because in its view the evidence defendant presents that was not disclosed by the State before the trial would have a reasonable probability of bringing about a different trial outcome. The evidence defendant identifies would not do so. It does not begin to outweigh the evidence the jury considered at trial that is highly probative of defendant's guilt.

First, the majority properly rejects defendant's argument that the State failed to disclose evidence related to defendant's bloody fingerprint on the knife. Although records indicate that the print was not useful on its own at first, an analyst went on to explain how the print was eventually evaluated and found to be a match with defendant. This evidence does not benefit defendant; thus, it cannot serve as a foundation for establishing a *Brady* violation.

Second, defendant asserts that the State's failure to disclose evidence of two other potential culprits prejudiced his defense. The majority does not appear to give this evidence much weight. Rightly so, because one of the potential suspects was incarcerated during the time the murders likely occurred, and the other was excluded as a possible source of the DNA found from Mrs. Baldwin's vaginal swab.

*Newby, J., dissenting*

Next, defendant argues that the State improperly withheld evidence from a witness interview with Carolyn Troy. Troy testified at trial that defendant spent hundreds of dollars a couple nights after the murders, but the prior witness interview indicates that Troy originally stated defendant had around $40 on his person on that same night. The majority claims that this evidence could have been used to impeach Troy's testimony, which helped the State show that defendant was spending money he stole from the Baldwins.

There are two problems with the majority's position. First, in addition to Troy's testimony, the State was able to present testimony from Tammy Rose Smith, who testified that defendant spent a couple hundred dollars or more just a couple hours after the crime likely occurred. The majority sidesteps this evidence and says that amount "is a far cry from the $1,800[2] that the State claims were stolen from the Baldwins." That response is unsatisfying. The evidence shows that defendant spent one-hundred dollar bills shortly after the robbery. That testimony is probative enough in its own right. There is no reason whatsoever to expect that someone who stole over one thousand dollars would spend the entirety of that sum only hours after acquiring it. Second, Troy's later testimony went into far greater detail about the large bills defendant possessed and the sums he spent on various purchases. This more detailed testimony would likely weaken the impact of any vague earlier statement she made.

---

[2] It is unclear precisely how much money was stolen from the Baldwins, but testimony indicates that about $1000 was likely stolen from Mr. Baldwin and as much as $800 from Mrs. Baldwin.

Therefore, a jury would still have substantial reason to believe Troy's subsequent testimony, and the State had presented other evidence of defendant's substantial spending after the crime on which it could rely even if Troy's testimony were undermined. Additionally, the SBI interviewed three other people who gave witness statements about defendant possessing one-hundred-dollar bills and spending them on cocaine. Thus, if the evidence of defendant's possession and spending of cash presented at trial had been at all questioned, these other three witnesses were available to support the State's case.

The majority also relies on undisclosed luminol tests and hair follicle samples. But these pieces of potential evidence have minimal probative value at best. The luminol tests indicated that bloody footprints were found in the home. The majority suggests that if such prints were found, then blood perhaps should have been found on defendant's shoes after the crime. The hair follicle collections revealed Caucasian hairs on the victims' bodies which could not have been left by defendant, who is Black. Yet, DNA testing and fingerprint analysis are well known to be more probative than hair follicle comparisons. Moreover, it is unclear that reports of Caucasian hair particles found on the victims would be helpful to defendant. The DNA test implicating defendant left only a 0.3% chance that the DNA left by the rapist belonged to a Caucasian person. Despite the fact that the footprints and the hair follicles do not point to anyone in particular, however, it is key that the DNA testing and fingerprint evidence *did* specifically implicate defendant. Evidence that implicates no

one does not invalidate or even significantly undermine solid evidence that implicates one person. Therefore, any introduction of evidence not pointing to a specific individual does not raise a reasonable probability that a different result would have been reached at trial, especially considering the two pieces of evidence that specifically implicate defendant.

In light of the strength of the evidence from the DNA and fingerprint testing, the majority finally resorts to attacking those things. Though the majority cannot point to any new evidence that would undermine the credibility of either the DNA test or the bloody fingerprint, it asserts that "the evidence against Mr. Best is not as strong as the State claims it is." As to the fingerprint, the majority states that defendant testified at trial that his bloody fingerprint was on the knife because he used a similar one to clean the gutters and scraped the back of his hand, meaning he could have touched the knife while he had blood on his fingers. The majority admits that defendant already tried this explanation at trial and that the jury did not have to believe him. Indeed, it would be implausible for the jury to believe him because the knife (1) bore defendant's fingerprint in Mr. Baldwin's blood after the knife had just been washed; (2) was found underneath the body of Mr. Baldwin, whose neck was sliced open;[3] and (3) rarely left the kitchen and was not used for yard work. But the

---

[3] The majority contests whose blood was on the knife as well as the location of the knife. The State reiterated multiple times throughout this case and in its brief that the blood found on the knife was Mr. Baldwin's and that the knife was found under the victim. If there is a dispute over this evidence, this dispute should be resolved by the trial court. The majority

majority nonetheless considers defendant's bare assertion significant as evidence that could undermine the State's case.

The majority then, confusingly, describes the DNA test results directly implicating defendant as "similarly underwhelming." It notes that "[t]he State's expert testified that, regarding the reliability of the DNA match, one out of every eighteen African-American men would match the sample recovered from Mrs. Baldwin." Stated another way, the DNA test revealed that if defendant were being falsely accused, there is only a one-in-eighteen chance, just over a five-percent chance, that he would be a match to the sample taken from Mrs. Baldwin's vaginal swab. Thus, the DNA test alone (without even considering the other evidence of defendant's guilt) presents a high likelihood that he raped Mrs. Baldwin. Of course, on top of that, defendant has been unable to point to a plausible alternative suspect of the same race to whom the DNA sample could belong. The majority simply asserts, contrary to logic and evidence, that the incriminating result of the DNA test is underwhelming.

The majority's ultimate contention is that, in its view, the State's evidence presented at trial is weak, and thus there is a reasonable probability the withheld evidence defendant identifies, had it been disclosed, would have produced a different result in the proceeding. But the evidence the State presented at trial is indeed strong, and the evidence defendant argues should be included is weak. The State has

---

states that it is not their job to weigh facts or find evidence, but that is exactly what the majority does here by making a finding about the placement of the knife.

shown: a statistically reliable DNA test directly implicating defendant as Mrs. Baldwin's rapist; defendant's bloody fingerprint on a likely murder weapon; uncontradicted testimony that defendant was at the Baldwin's home before the crime; and testimony that defendant possessed and spent considerable sums of cash soon after the Baldwins were robbed of a considerable sum of cash. Defendant, on the other hand, has only: minimally called into question just one witness's statement as to precisely how much cash defendant carried a couple days after the murders; pointed to two other potential culprits, whom the evidence has generally ruled out as the assailants; and identified some tests and samples that do not implicate defendant (or anyone else in particular). As the superior court determined, a rational jury would not conclude that any reasonable doubt existed as to defendant's guilt.[4]

Thus, even if the additional evidence to which defendant points had been available for trial, there is not a reasonably probability that the jury would have reached a different result. Holding otherwise, the majority weighs the evidence in favor of defendant, inappropriately attempts to undermine strong evidence supporting the State's case, and inflates the significance of flimsy evidence defendant uncovered later. If there is a conflict in the evidence, this issue should be remanded

---

[4] The evidence here indicates that the knife was found under the victim. The State reiterated this point multiple times throughout the case and in its brief. If there is a dispute over this evidence, this dispute should be resolved by the trial court. The majority states that it is not their job to weigh facts or find evidence, but that is exactly what the majority does here by making a finding about the placement of the knife.

to the trial court. The superior court's denial of defendant's motion for appropriate

relief should be affirmed. I respectfully dissent.[5]

---

[5] Defendant also asserts that his trial counsel's representation was unconstitutionally deficient. I disagree. Defendant has not shown either that his trial counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment or that there is a reasonable probability that, but for counsel's purported errors, the result of the proceeding likely would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S. Ct. 2052, 2064–69 (1984).